**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Sarah L. Phillips-Foster,

Plaintiff,

v.

UNUM Life Insurance Company of America, Nancy Ruhland as parent and natural guardian of Ian G. Foster and Craig A. Foster, minor children, Jeramy T. Foster, Angela Sue Whitwam, Victoria Poshard, and Diane Della Busta as guardian ad-litem for Zoe Elizabeth Phillips, a minor child,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-1572 ADM/SRN

---

David G. Johnson, Esq., Borkon, Ramstead, Mariani, Fishman & Carp, LTD, Minneapolis, MN, attorney for Plaintiff.

Terrance J. Wagener, Esq., and John Harper III, Esq., Krass Monroe, PA, Minneapolis, MN, attorneys for Defendant UNUM Life Insurance Company of America.

Steven C. Pundt, Esq., and Roger A. Gershin, Esq., Minneapolis, MN, attorneys for Defendants Nancy Ruhland and Jeramy T. Foster.

---

## I. INTRODUCTION

On July 18, 2001, Defendant UNUM Life Insurance Company of America ("UNUM") argued before the undersigned United States District Judge its Motion for Summary Judgment, to Deposit Funds, and to Dismiss [Doc. No. 33]. Plaintiff Sarah L. Phillips-Foster ("Phillips-Foster") argued her Motion for Partial Summary Judgment [Doc. No. 37]. Defendants Nancy Ruhland and Jeramy T. Foster argued their Motion for Summary Judgment against UNUM [Doc. No. 40]. UNUM seeks

OCT 0 2 2001
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD OCT 0 2 2001
DEPUTY CLERK

(1) summary judgment on ERISA claims, (2) leave to deposit with the Court life insurance proceeds not subject to the suicide exclusion, (3) and dismissal of the state law claims based on ERISA preemption. For the reasons set forth below, UNUM's Motion for Summary Judgment is granted, its Motion to Deposit Funds is granted, and its Motion to Dismiss is granted. Phillips-Foster's Motion for Partial Summary Judgment is denied, and Defendants Nancy Ruhland and Jeramy T. Foster's Motion for Summary Judgment is denied.

## II. BACKGROUND

### A. The Policy

Phillips-Foster and the individual Defendants seek life insurance proceeds from UNUM under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq.* ("ERISA"), as a result of the death of Mark Steven Foster ("Foster"). On October 10, 1995, UNUM issued a group insurance policy to Drug Emporium, Inc., to provide insurance coverage for Drug Emporium employees. As a benefit of his employment as a pharmacist at Drug Emporium, Foster received coverage under Group Policy Number 292000 (the "Policy").

The Policy divides coverage into life insurance plan coverage ("Basic Life") and accidental death and dismemberment insurance coverage ("AD&D"). Id. at PL 003-007. The Policy identifies the "Life Insurance Benefit" as consisting of a "Basic Benefit" and an "Additional Benefit Option." Id. at PL 004. As a full time pharmacist with less than five years in the position, Foster was eligible for $100,000 in basic coverage, with an option to purchase additional benefit coverage. Id. Foster purchased "Option B" additional coverage in the amount of $100,000. Id. Thus, his "Life Insurance Benefit" was $200,000. The AD&D component of Foster's life insurance was in "[a]n amount equal

to [the] life amount," for an additional $200,000. Id. at PL 007. The total value of the policy is therefore $400,000.[1]

The Policy provides an express exclusion for both the Basic Life and AD&D coverages where death is caused by, contributed to by, or results from suicide. Id. at PL 030, 035.[2] The suicide exclusion applies to both the Additional Benefit and the AD&D portions of the Policy, leaving only the $100,000 Basic Life portion unaffected by the exclusion.[3]

The Policy provides an express reservation of discretionary authority to UNUM as follows: "When making a benefit determination under the Summary of Benefits, UNUM has discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions of the Summary of Benefits." Perrigo Aff. at PL 022.

---

[1] Internal UNUM e-mail communications also calculate the total policy value as $400,000. See id. at CL-142, 239, 242, 257. The Policy also includes additional coverage called a "Repatriation Benefit" in the amount of $5,000 if the insured died as a result of an accidental death suffered more than 75 miles from the insured's principal residence. Id. at PL 007. To receive the Repatriation Benefit, "the accidental death benefit must be paid first." Id.

[2] The "suicide exclusion" for the Basic Life portion applies to any amounts of insurance for which Foster paid all or part of the premium. Id. at PL 030. Under the Policy, Foster's employer paid the cost of coverage for the Basic Benefit portion, while Foster paid the cost of coverage for the Additional Benefit (Option B) portion. Id. at PL 003. Thus, the suicide exclusion applies to the Additional Benefit portion of the Policy. Also, since payment of the AD&D is a necessary condition to receiving the Repatriation Benefit payment, the suicide exclusion precludes payment of the Repatriation Benefit in the event of an AD&D denial.

[3] UNUM agrees with Defendants that the $100,000 Basic Life portion is payable to someone, but may not pay until it is determined whether or not Phillips-Foster was involved in Foster's death. Minn. Stat. § 524.2-803(d) prevents an insurance company from paying beneficiaries who "feloniously and intentionally kill" the insured. Id. at CL-137, 252, 259.

**B. The Facts**

On July 18, 1997, a murder mystery began. Mark Foster's body was found on the side of the road in rural Douglas County, Wisconsin. The cause of death was a gunshot wound to the chest. Douglas County police subsequently began a homicide investigation. Id. at CL 359. On July 19, 1997, the investigators interviewed Phillips-Foster, Foster's wife, and Brent Thompson ("Thompson"), Foster's nephew. Phillips-Foster said that she last saw Foster on July 17, 1997, the afternoon before his death. Id. at CL-283. Thompson said he last saw Foster between 2 and 2:30 a.m. on the morning of July 18, 1997. According to Thompson, Foster had been having problems with Jack Frazier, and was "going to meet Frazier at a Country Kitchen Restaurant and straighten things out." Id. at CL 309. Thompson had called the Minneapolis Police Department on July 18, 1997, prior to the discovery of Foster's body, to make a missing persons report, telling investigators that Frazier was the primary suspect in Foster's disappearance. Id. at CL-289. Greg Friesner ("Friesner"), Foster's housemate and student, told the Minneapolis investigators that Frazier knew Foster was a pharmacist and had threatened the lives of Foster and his family if Foster did not "make some drugs for him." Id. CL-289. Friesner asserted that he had seen Frazier riding a motorcycle in the vicinity of Foster's residence on the evening of July 17, 1997. Id. at CL-283.

Friesner said that when he last saw Foster he did not seem frightened or scared, but that Foster seemed "morose." Id. at CL-278. Phillips-Foster and Thompson told the investigators that Foster had been "acting very strange lately," and that Foster believed Frazier was going to kill him. Curiously, after informing Phillips-Foster and Thompson of Foster's death and interviewing them for 45 minutes, Detective John McKenzie, of the Douglas County Sheriff's Department, noted that "[a]t no time did [Phillips-Foster] or [Thompson] ask . . . how was [Foster] killed or where he was

killed." Id. at CL-309-310, 361-362.

Police investigators then interviewed Frazier. Frazier had lived with Phillips-Foster for four years. In February, 1997, while Frazier was out of town, Phillips-Foster suddenly moved out, moved in with Foster, and married Foster on April 1. Frazier told investigators that he believed Phillips-Foster was trying to set him up, and stated that he had been in Massachusetts from 8:00 a.m. on Monday, July 14, 1997, before Foster's death, through 7:30 p.m. on Friday, July 18, after Foster's body was found.[4] Frazier established an alibi by turning over to the Douglas County Sheriff's Department a luggage tag from Northwest flight 309, which returned to Minneapolis from Boston at about 7:30 p.m. on July 18, and an itinerary from Yada Systems for his travel of the week of July 14 through July 18. Id. at CL-280.

Upon searching a storage facility used by Foster, investigators found that the 44-caliber magnum rifle owned by Foster and stored there was missing. Id. at CL-311. Foster's son Jeramy stated to investigators that he gave to Foster the only key to the cabinet in June, 1997, and that Jeramy himself had previously seen the rifle in the storage cabinet. Id. at CL-313-314. The security log at the storage unit showed that Foster had entered the unit at 4:36 p.m. on July 17, 1997. Id. at CL-312. The storage unit manager, Rika Carlson, also identified Foster's car entering the lot on the security videotape for July 17, 1997. Id. The rifle was never found.

UNUM learned from Detective Sergeant Gulbrandson, of the Douglas County Sheriff's Department, on November 24, 1998, that Foster was shot with a 44-caliber rifle. Id. at CL-033. Sergeant Gulbrandson stated that he believed Foster "did help plan his death and this was a murder for hire." Id. UNUM also learned from Tim O'Shay, Assistant U.S. Attorney for the Western

[4] Foster's body was found on the afternoon of Friday, July 18, 1997. Id. at CL-317.

District of Wisconsin, that Phillips-Foster had not been ruled out as a suspect in Foster's death. Id. at CL-137-139. UNUM had reports that Foster was believed to have been killed by two friends who were fellow members of a cult led by Foster, but that he had left a clue in his shoe pointing to someone else. Id. at CL-151. The note in his shoe, however, was believed to be a false clue directing attention away from friends and family as suspects. Id. at CL-150.

UNUM learned from Roger Williamson, an occult bookstore owner who had known Foster for five years, that Foster believed himself to be a Voodoo high priest, or "Santaro," and he practiced several different religions, including Santeria, Voodoo, Tantra, and Palo Mayombe. Id. at CL-164-165. UNUM also learned from Victoria Poshard ("Poshard"), a former girlfriend of Foster's, that Foster and Friesner believed that within them was a line of priests whose powers transfer from one person to the next when the next priest in line kills his teacher. Id. at CL-300. Poshard said Foster often had rituals in his house with people aged 15 and up, and that his student Friesner stayed with Foster to "help him with his destiny of death by [Friesner's] hands." Id. at CL-169, 300. Poshard told the police investigators that Foster wanted to be killed by Friesner because Friesner was the next "chosen one" in the cult. Id. at CL-355. Foster told his friend Adam Fisher ("Fisher"), who had lived with Foster in 1996, that someday he (Foster) would be killed, and his soul would pass into the body of his student. Id. at CL-292-296.

Fisher told UNUM that Friesner was dedicated to Foster's teachings,[5] and he believed Friesner killed Foster. Id. at CL-163. He said that "if [Friesner] killed [Foster], it would have been an arrangement established beforehand by both of them." Id. Fisher believed that the "psychological

[5] In her deposition, Phillips-Foster stated that she learned about the Santeria religion from Foster, and that both he and his student Friesner "aligned" themselves with an "Orisha" named Legba, who supposedly functioned as a personal guide or "assistant." Id. at CL-054.

instability" of both Friesner and Foster[6] made him feel that they were both capable of doing that. Id. Fisher also said that Foster often had "delirious psychosis" where he would hold firearms from his gun collection and talk about how he wished that his life would end. Id. at CL-162. Foster once told Fisher that in order for Foster to reach "sainthood," Friesner would have to take his life. Id.

Jackie Bailey was a friend of Phillips-Foster, and had met Foster through his ex-wife Tammy, who was also Phillips-Foster's sister. She also told UNUM that Foster had beliefs and practices in Santeria, had an alter in his attic, that he had a plan for Friesner to kill him so that his soul would transfer into Friesner's body, and that he had a "murder suicide thing" plotted. Id. at CL-155.

UNUM also learned that Phillips-Foster was likely aware of the suicide-murder plot. Bailey told UNUM that Phillips-Foster knew about the plot, and also about the insurance policy. Id. at CL-155-156. Phillips-Foster had told Bailey that she knew who had killed Foster, and that she was not concerned for her own safety. Id. at CL-157. UNUM also interviewed Nicolle Dorrian. Dorrian met Phillips-Foster in a bar in January, 1996, and she and Phillips-Foster started dating. Id. Phillips-Foster told Dorrian that Foster was "OK" with them all living together, and that she had found "a really neat religion." Id. at CL-157. She told Dorrian that Foster had "lots of money," and that if anything ever happened "she would be taken care of." Id. Phillips-Foster told Dorrian that she was going to have a baby with Foster, and that she would "never have to worry about money again." Id. Phillips-Foster was pregnant with Foster's baby at the time of his death. Id. at CL-066.

On the same day as his death, Foster made a "good-bye" videotape. On the tape, he recorded

[6] Foster was admitted to St. Johns Northeast Hospital in February, 1995, for treatment subsequent to a "suicide gesture." Id. at CL-143. Foster had grabbed a gun and bullets and apparently had attempted to use them on himself. Id. In the year prior to his hospitalization, Foster had exhibited signs of depression. Id.

messages to his unborn child and other children and spoke of his love for Phillips-Foster. Id. at CL-135. He also spoke of a long journey he was taking, sang and played religious songs on his harmonica, and talked about meeting his ancestors. Id. He discussed how he felt he had been given the powers of God, told his family not to be afraid of death because he was not afraid, and talked about going to the "other side." Id. Foster also left his nephew a letter to be opened in case of his death in which he outlined arrangements for handling his funeral. In this letter, he wrote his own obituary, and he gave the names of his insurance carriers and policy numbers. See id. at CL-292-296.

UNUM also learned from Detective Sergeant Gulbrandson that there was a high probability that Foster was involved in his own death, and that Phillips-Foster was a suspect in the death of Foster. Id. at CL-253, 270, 384. Detective John McKenzie, of the Douglas County Sheriff's Department, provided a written statement on September 9, 1997, to the UNUM internal claims specialists that Phillips-Foster, along with Friesner and Thompson, were the main suspects in the homicide case.[7] Id. at CL-358. He also stated that Foster himself was believed to be "instrumental" in planning his own murder. Id. at CL-354. Detective Bob Smith also called UNUM on September 9, 1997, and told them that "[Phillips-Foster] is definitely involved." Id. at CL-386. Detective McKenzie was meeting with the FBI at the time regarding an insurance fraud investigation, as Foster had taken out another $300,000 life insurance policy with a different insurance provider one week prior to his death. Id.

Phillips-Foster contends that the information UNUM received was unreliable and that it was

---

[7] Sgt. Gulbrandson stated that even if Foster was involved in his own murder-suicide death, the others committing the killing would still be charged with homicide. Id. at CL-350.

unreasonable for UNUM to rely on it because several of the sources admitted knowing that Foster often lied and made up stories. She argues that Adam Fisher said Foster was good at telling lies, playing mind games and fabricating events. Id. at CL-162. Jenny Soule, a co-worker with Foster at Drug Emporium, also told UNUM that she did not believe many things Foster said when he talked about Voodoo and sacrifices on several occasions. Id. at CL-164. Roger Williamson said that Foster had a habit of "messing with people." Id. Poshard also stated that she did not believe some of the things Foster told her, and that Foster had "spun some wild stories." Id. at CL-300, 327. Phillips-Foster further attacks the credibility of the people interviewed, including the fact that some of them were also involved in an custody battle with Foster, and various other factors that do not directly support a suicide, such as the decedent having had a lease on a new house, there was no religious paraphernalia left at the site where the body was found, the decedent's body was not "adored" [sic] in any fashion with ritualistic markings when it was found. Pl. Mem. at 8. [Doc. No. 38]. Phillips-Foster therefore argues that the evidence relied on by UNUM in denying the claim consisted too heavily of "heresy" statements that should not have been taken at face value. Id. at 9, 18.

UNUM issued, on the basis of the information learned in its investigation, a rejection letter on December 8, 1998, denying coverage for the $300,000 portion of the policy that was subject to the suicide exclusion. It also withheld payment of the $100,000 Basic Life portion, uncertain if the named beneficiary, Phillips-Foster, could legally receive payment under Minn. Stat. Ann. § 524.2-803 (West 1997).

## III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

### A. UNUM's Motion for Summary Judgment

Phillips-Foster is entitled to judicial review of UNUM's decision to deny benefits of a life insurance policy that was issued under ERISA. In determining the standard of review appropriate in the ERISA context, the Supreme Court has observed that ERISA "abounds with the language and terminology of trust law," and that "trust principles make a deferential standard of review appropriate when a trustee exercises *discretionary* powers." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110-111 (1989) (emphasis added). "While ERISA itself does not specify the standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the plan gives the 'administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Donoho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996) (quoting Firestone, 489 U.S. at 115). If the plan gives such discretionary authority, the plan administrator's decision is reviewed only for abuse of discretion. See id. Such decisions "will not be disturbed if reasonable." Firestone, 489 U.S. at 111. In the context of ERISA, the proper reading of "reasonable" is "not immoderate or excessive." Donaho, 74 F.3d at 899. That is, "a trustee decision is reasonable if a reasonable person *could* have reached a similar decision, given the

evidence before him, not that a reasonable person *would* have reached that decision." Id. (emphasis in original). The decision reached need not be the only sensible one, but it need only offer a reasoned decision that is based on evidence supporting a particular outcome. Id. A decision supported by a reasonable explanation should not be disturbed even if a different decision would have also been reasonable. See id.

More specifically, the District Court may only overturn a decision of a plan administrator (in the absence of bad faith or conflict of interest) if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Id. at 900 (citation omitted). This substantial evidence element requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," or "more than a scintilla but less than a preponderance." Id. at 900 n.10. Any decision made by a plan administrator with discretion "must be upheld if a reasonable mind would find that the decision was adequately supported by the evidence on record." Id. at 900. This is true even if the reviewing court might have reached a different result had the matter been before it *de novo*. Id. A reviewing court may not overturn a discretionary trustee decision simply because the court disagrees with that decision. See Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).

In evaluating the decision of a plan administrator or fiduciary, the court does not substitute its own weighing of the evidence for that of the fiduciary. See id. "To do so would be to ignore the appropriate deferential standard of review and impose an improper *de novo* review." Id. Moreover, only evidence that was before the plan administrator when it made its final decision may be considered by the court. Id.

The parties concede that UNUM reserved "fiduciary rights to exercise discretion." Pl. Mem.

at 10. The text of the plan itself expressly granted this discretionary authority to UNUM as a fiduciary. Perrigo Aff. at PL 022.[8] Therefore, the appropriate standard of review is abuse of discretion.

If a benefit plan gives discretion to a fiduciary who is operating under a conflict of interest, however, that conflict is weighed as a factor in determining whether an abuse of discretion occurred. Firestone, 489 U.S. at 115. If a conflict of interest exists, an adjusted standard of review may be appropriate. To obtain a less deferential standard of review, material, probative evidence must be presented demonstrating that "(1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty . . . ." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). The second part of this test requires a showing only that the conflict or procedural irregularity has "some connection" to the decision reached by the plan administrator or fiduciary. Id. However, this second prong does present "a considerable hurdle for plaintiffs." Barnhart v. UNUM Life Insurance Company of America, 179 F.3d 583, 588 n.9 (8th Cir. 1999). The claimant's evidence must create "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Id. (quoting Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir. 1998); accord Heaser v. Toro Co., 247 F.3d 826, 833 (8th Cir. 2001).

If both prongs of the Woo test are met, a less deferential standard applies. The Eighth Circuit has adopted the "sliding scale" approach, where a court still reviews for abuse of discretion,

[8] While the Policy identifies Drug Emporium, Inc., as the plan administrator (Perrigo Aff. at PL 039), UNUM still qualifies as a "fiduciary" under the ERISA definition of a fiduciary as one who exercises any discretionary control respecting the management of a plan, or exercises any authority or control respecting disposition of assets. 29 U.S.C. § 1002 (21)(a).

but decreases the amount of deference given to the plan administrator in proportion to the seriousness of the conflict of interest or procedural irregularity. Woo, 144 F.3d at 1161. To be upheld, the evidence supporting a plan administrator's decision must increase proportionally to the degree of conflict or irregularity that triggered the sliding scale test. Id. at 1162.

In order to warrant the less deferential "sliding scale" standard, claimants would have to show a palpable conflict of interest or a serious procedural irregularity in UNUM's decision-making procedure. The bare fact that an insurance company both pays life insurance claims and also has discretion to determine when a policyholder may have committed suicide or assisted-suicide cannot alone be the basis for a "palpable conflict of interest." To so hold would presumptively create a conflict in any case against an insurer, thereby predicating the use of the "sliding scale" in all insurance coverage cases and eviscerating the function of the abuse of discretion standard of review. UNUM conducted numerous interviews of individuals who knew, worked with, lived with, and dated the decedent, as well as with multiple investigating police officers assigned to the homicide case. Claimants have provided no probative evidence of a procedural irregularity or extraordinary conflict of interest that contaminated this decision-making process, let alone demonstrated that such a conflict was cause for serious doubt as to whether UNUM's decision was arbitrary, or made on mere whim. Thus, the sliding scale approach is not warranted in this case, and the usual deference accorded by the abuse of discretion standard is appropriate.

Applying this deferential standard, the Court looks to see whether UNUM had reasonable evidence for exercising its discretion. Based on its interviews and investigations, UNUM procured evidence that decedent Foster was involved in a religious cult, along with Friesner, Thompson and Phillips-Foster. UNUM had evidence that Friesner, Thompson and Phillips-Foster were attempting

to frame Jack Frazier for Foster's death. Various people told UNUM that Foster believed himself to be a high priest in the Santeria religion, practiced Voodoo rituals in his attic, and had a relationship with Friesner as a religious student. UNUM learned that Foster believed if he was killed by his student, his powers and soul would pass into the body of his killer, and that Foster believed his student Friesner was the "chosen one" for helping Foster fulfill his "destiny of death." He had been institutionalized in the past for having committed "suicide gestures." Foster had made numerous refinements to his life insurance policy with UNUM, and also taken out an additional life insurance policy with another carrier one week prior to his death. UNUM developed suspicion that Phillips-Foster was aware of Foster's alleged plan to have Friesner kill him, and she had made multiple statements to the effect that she would never have to worry about money again if Foster were to be killed. Foster also had personal acccss to a 44-caliber magnum rifle, the same type of gun with which he was killed. Further, Foster had created a videotape the day on which he was killed to say goodbye to his friends and family, as well as leaving a detailed letter for his nephew articulating funeral and life insurance collection plans, as well as leaving a pre-written obituary.

This evidence gave UNUM a reasonable basis on which to believe that Foster was likely involved in orchestrating his own murder-suicide, and that Phillips-Foster was possibly involved. The Douglas County police officers investigating the homicide case confirmed this suspicion, informing UNUM on multiple occasions that the police also believed Foster was "instrumental" in crafting his own demise, and that Phillips-Foster, Friesner and Thompson were the main suspects in the homicide case. This compilation of evidence is a sufficient basis of substantial evidence upon which a reasonable mind could find that UNUM's decision to invoke the suicide exclusion was adequately supported.

The counter-evidence cited by Phillips-Foster, even if it were so substantial that it could cause a reasonable person (or a reviewing court under *de novo* review) to reach a different decision, matters not, as long as the supporting evidence before UNUM at the time the decision was made was sufficient to lead a reasonable person to the same conclusion. This Court finds that a reasonable person could have decided that the suicide exclusion should be operative on the basis of the evidence that was before UNUM at the time it so decided. As such, the deference given to a fiduciary's decision compels a finding that UNUM did not abuse its discretion. Because Defendant UNUM did not abuse its discretion, it is entitled to judgment as a matter of law. Defendant UNUM's Motion for Summary Judgment is granted.

**B. UNUM's Motion to Deposit Funds**

It is equally as reasonable that UNUM withheld payment of the $100,000 that was not subject to the suicide exclusion, given the possible involvement of the beneficiary Phillips-Foster in the death of the insured. Defendant UNUM's Motion to Deposit Funds to the court in the amount of the $100,000 Basic Life policy, plus appropriate interest calculated at the amount of 5.88 percent per annum from the date of Foster's death, is granted. UNUM concedes that this amount is payable, and it is hereby directed to deposit these funds with the court for determination of the proper beneficiary or beneficiaries.

**C. UNUM's Motion to Dismiss**

The parties agree that the claims and defenses in this case are governed by ERISA. Pl. Mem. at 1, 10. The insurance policy at issue qualifies as an employee welfare benefit plan under ERISA. See 29 U.S.C. § 1002(1). ERISA contains a straightforward preemption provision stating, in relevant part, that "the provisions of this chapter . . . shall supersede any and all state laws insofar

as they may now or hereafter relate to any employee benefit plan." 28 U.S.C. § 1144(a). This clause functions to preempt all common law tort and contract claims relating to a policy brought against a plan administrator in the ERISA context. Harper v. R.H. Masey & Co., Inc., 920 F.2d 544, 546 (8th Cir. 1990); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987). Thus, all claims brought against UNUM under state common law for breach of contract are preempted. UNUM's Motion to Dismiss these claims is granted.

**D. Phillips-Foster and Individual Defendants' Motions**

Because this Court has determined that Foster's life insurance coverage subject to the suicide exclusion was not improperly denied under the discretion vested in UNUM under the Policy terms, and that the remainder of the insurance proceeds are to be deposited to the court for determination of the proper beneficiary, the Phillips-Foster and individual Defendants' motions are moot. Thus, this Court will not address Phillips-Foster's Motion for Partial Summary Judgment, or Defendants Nancy Ruhland and Jeramy T. Foster's Motion for Summary Judgment.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant UNUM's Motion for Summary Judgment [Doc. No. 33] is **GRANTED**;
2. Defendant UNUM's Motion for Leave to Deposit Funds [Doc. No. 33] is **GRANTED**;
3. Defendant UNUM's Motion to Dismiss [Doc. No. 33] is **GRANTED**;
4. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 37] is **DENIED**;
5. Defendants Nancy Ruhland and Jeramy T. Foster's Motion for Summary Judgment [Doc. No. 40] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Ann Montgomery

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: October 2, 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd